**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

PUYALLUP TRIBE OF INDIANS,

                Plaintiff,

    v.

NATIONAL MARINE FISHERIES
SERVICE and UNITED STATES FISH
AND WILDLIFE SERVICE,

                Defendants.

No.  26-cv-05788

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

1

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

**INTRODUCTION**

1.      The Puyallup Tribe of Indians challenges the joint decision by the National Marine Fisheries Service (NMFS) and the United States Fish and Wildlife Service (USFWS) (collectively, Services) to rescind their longstanding definitions of the term "harm" under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq*. This rescission defies the well-established, not to mention commonsense, truth that just as spearing and shooting kills or injures listed fish and wildlife, so too do activities that destroy or degrade the habitat upon which they rely to shelter, feed, migrate, reproduce, and rear their young. The Services' rescission subverts the purpose and text of the ESA, longstanding agency practice, and Supreme Court precedent. It must be set aside.

2.      In 1973, Congress enacted the ESA, which remains "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ultimate goal of the ESA is to recover endangered and threatened species to the point where they no longer need ESA protection. 16 U.S.C. §§ 1531(b), 1532(3). In both the statutory text and legislative history, Congress made plain that habitat destruction and degradation is a principal threat to imperiled species and enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id*. § 1531(b).

3.      In support of the ESA's goals, Congress made it "unlawful for any person" to "take" listed fish or wildlife species within the United States, territorial seas, or high seas. *Id.* §§ 1538(a)(1), 1533(d). The ESA defines the term "take" to mean "to harass, *harm*, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19) (emphasis added). Congress intended this prohibition against take of listed fish

COMPLAINT FOR DECLARATORY AND          2          KANJI & KATZEN, P.L.L.C.
INJUNCTIVE RELIEF                                                         811 1st Ave., Suite 640
                                                                                            Seattle, WA 98104

and wildlife to be interpreted broadly to include "every conceivable way in which a person can 'take' wildlife." S. Rep. No. 93-307, at 7 (1973).

4.      For over fifty years, the USFWS has interpreted and defined "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; 40 Fed. Reg. 44,412, 44,416 (Sept. 26, 1975); 46 Fed. Reg. 54,748, 54,748 (Nov. 4, 1981).

5.      In 1995, the Supreme Court upheld USFWS' definition of "harm," explaining that the definition comported with "an ordinary understanding of the word." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 697 (1995) (hereinafter "*Sweet Home*"). Moreover, the Supreme Court concluded that "the broad purpose of the ESA supports" the definition, and that a 1982 amendment to the Act "strongly suggests that Congress understood [the Act] to prohibit indirect as well as deliberate takings." *Id*. at 698–700.

6.      In 1999, NMFS promulgated a substantively matching definition of "harm," which includes "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102; 64 Fed. Reg. 60,727, 60,727 (Nov. 8, 1999).

7.      In the 1854 Treaty of Medicine Creek, 10 Stat. 1132, Art. III, the Tribe reserved its "right of taking fish," which encompasses a right to take all species of finfish and shellfish found within the Tribe's traditional fishing areas. *E.g.*, *United States v. Washington*, 157 F.3d 630, 643 (9th Cir. 1998). In the nearly two centuries since the Treaty was signed, as detailed

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

3

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

below, several of the species for which the Tribe reserved fishing rights by treaty have experienced such precipitous declines as to require listing under the ESA. Habitat destruction and modification has been a major driver of these listings.

8.      On July 14, 2026, the Services repealed their respective regulatory definitions of "harm." Rescinding the Definition of "Harm" Under the Endangered Species Act, 91 Fed. Reg. 43,300 (July 14, 2026) ("Rescission"). For the first time since the ESA's enactment, the Services have called into question the axiomatic principle that listed fish and wildlife are harmed—i.e., taken—when they are killed or injured as a result of significant modification and degradation of their habitat. In the Rescission, the Services explicitly adopt an interpretation explicated by Justice Scalia in dissent to *Sweet Home*, which would purport to make it lawful to kill or injure listed fish and wildlife through destruction or degradation of their habitat modification merely because the harm is indirect.

9.      The Rescission frustrates the very purpose of the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). It will cause regulatory confusion regarding the ESA's requirements, unlawfully reduce protections for habitat of listed species in agency decisions, and disturb the decades-long reasonable reliance interests of Tribes, States, regulated entities, and others. Moreover, it will cause further interference with the Tribe's Treaty-reserved fishing rights.

10.      The complete reversal of the Services' longstanding position is not supported by any rational legal interpretation of the ESA or any meaningful analysis of the reliance interests described in the public comments. The Rescission, including the new interpretation adopted therein, violates the plain language and overarching purpose of the ESA, lacks any reasoned

COMPLAINT FOR DECLARATORY AND          4          KANJI & KATZEN, P.L.L.C.
INJUNCTIVE RELIEF                                            811 1st Ave., Suite 640
                                                                        Seattle, WA 98104

basis, and is arbitrary, capricious, and contrary to law under the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq*.

11.     Despite the severe environmental implications of this radical shift in policy and interpretation, the Services did not engage in any review under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, even though the Rescission will have significant impacts on the human environment and is not compelled by statute. No categorical exclusion exempting the Services from NEPA review is available because the Rescission raises extraordinary circumstances.

12.     Likewise, the Services violated Section 7 of the ESA, 16 U.S.C. § 1536, by failing to consult regarding the impacts of the Rescission on imperiled species and their critical habitat, ignoring the critical mandate designed to ensure federal agencies avoid actions that are likely to jeopardize listed species or impair the habitat needed for their survival and recovery.

13.     To remedy these violations, the Tribe seeks an order from this Court declaring the Rescission unlawful, vacating the Rescission, prohibiting reliance on the Rescission, and reinstating the regulatory definitions of "harm" that guided the Services' administration of the ESA for over fifty years.

## JURISDICTION AND VENUE

14.     This action is brought under the APA, 5 U.S.C. §§ 701-706, and the ESA, 16 U.S.C. § 1540(g)(1).[1]  This Court has subject matter jurisdiction under 28 U.S.C. § 1331

---

[1] Pursuant to 16 U.S.C. § 1540(g)(1), the Tribe will provide 60 days' notice of its intent to sue the Services for failure to consult on the rescission in violation of ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2). If the Services fail to provide a satisfactory response, the Tribe will take appropriate steps to amend this Complaint to include this claim at the conclusion of the 60-day period.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

5

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

(Federal Question) and 28 U.S.C. § 1362 (Indian Tribes). The relief requested herein is authorized by 28 U.S.C. § 2201 (Declaratory Relief) and § 2202 (Injunctive Relief).

15.     Venue is proper in the U.S. District Court for the Western District of Washington under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3), as Plaintiff Puyallup Tribe of Indians resides within the Western District of Washington and many of the consequences of the Services' violations of law giving rise to the Tribe's claims occur or will occur in this district.

## PARTIES

## I.     PLAINTIFF

16.     The Plaintiff in this action is the Puyallup Tribe of Indians. The Puyallup Tribe of Indians is a sovereign, federally recognized Indian tribe whose reservation is located in and in areas around Tacoma, Washington. The Tribe is signatory to the 1854 Treaty of Medicine Creek with the United States in which the Tribe reserved its "right of taking fish at usual and accustomed grounds and stations." Treaty of Medicine Creek, 10 Stat. 1132, Art. III; Puyallup Tribe of Indians Settlement Act of 1989, 25 U.S.C. §§ 1773 *et seq*. (Pub. L. No. 101-41, 103 Stat. 83 (June 21, 1989)). Puyallup's usual and accustomed areas (U&A) include but are not limited to the Puyallup River watershed, Commencement Bay and surrounding waters of Puget Sound, and additional inland fresh waters. The vast majority of the waters in which Puyallup reserved its fishing rights through the Treaty of Medicine Creek lie outside of Puyallup's reservation. The Tribe co-manages the fisheries along with the Washington Department of Fish and Wildlife.

17.     As the United States Supreme Court has long recognized, the Tribe's right to fish at traditional fishing places is "not much less necessary to the existence of the Indians than

COMPLAINT FOR DECLARATORY AND                    6                KANJI & KATZEN, P.L.L.C.
INJUNCTIVE RELIEF                                                  811 1st Ave., Suite 640
                                                                  Seattle, WA 98104

the atmosphere they breathed." *United States v. Winans*, 198 U.S. 371, 381 (1905). Members of the Puyallup Tribe of Indians and their ancestors have resided and fished in and around the Puyallup River watershed, Commencement Bay, and surrounding areas of Puget Sound for thousands of years. Harvesting fish, shellfish, and other aquatic species remains fundamental to the Tribe's subsistence, spiritual and cultural identity, and economy today. The Tribe maintains a robust fishery and fishing culture, harvesting both finfish, including salmonids, and shellfish. In addition, the Tribe conducts fisheries throughout its U&A to obtain fish for ceremonial use for its people (including funerals, weddings, and honoring and gifting observances, as well as other practices). Subsistence harvests from the Tribe's U&A are a key element of the diet of many tribal members, and commercial harvest remains essential for the livelihood of many Puyallup members. Protection of habitat throughout the species' range is essential to protecting the Tribe's rights under the Treaty of Medicine Creek to harvest and eat finfish, shellfish, and other aquatic life. Since time immemorial, the Tribe has been a steward of the freshwater, marine, and terrestrial environments upon which the Puyallup people have depended for their economic, subsistence, religious, spiritual, and ceremonial livelihoods.

18.     All anadromous fish, including salmon, steelhead, and bull trout listed under the ESA, that spawn in and return to the Tribe's U&A require healthy habitat throughout their ranges. Clean water, cool temperatures, and other essential habitat features are essential to support listed salmonid's ability to spawn, forage, and migrate throughout their life cycles. The Tribe invests substantial resources in its fishery management and water quality programs. The Tribe's biologists regularly work in coordination with federal, state, and other tribes' resource agencies to preserve and enhance the region's fish resources, including efforts to prevent harm to salmonids that results from habitat destruction or degradation. Protecting the Tribe's Treaty

fishing rights requires ensuring that habitat modification and degradation, including in marine benthic, eelgrass, nearshore, estuary, and freshwater stream environments, does not kill or injure the listed species. The Tribe has taken an important leadership role in working to maintain and recover salmonid stocks in the region.

19.    In accordance with the Treaty of Medicine Creek, the Tribe's members reserved the right to fish for all species of Pacific salmon (including Chinook, coho, sockeye, pink, and chum) and trout (including steelhead and bull trout). Unfortunately, because Puget Sound Chinook salmon, Puget Sound steelhead, bull trout, and Southern Resident killer whales (which rely on Chinook salmon as the preferred prey for their diet) have been listed as endangered or threatened, the Tribe has not been able to fully exercise its treaty fishing right, both due to the listings themselves, as a result of the declining populations, and the harvest restrictions with respect to unlisted species that are necessary to protect the listed fish. *See*, *e.g.*, Four Chinook Salmon ESU Listing, 64 Fed. Reg. 14,308 (Mar. 24, 1999); Puget Sound Steelhead Listing, 72 Fed. Reg. 26,722 (May 11, 2007); Bull Trout Listing, 64 Fed. Reg. 58,910 (Nov. 1, 1999); Southern Resident Killer Whale Listing, 70 Fed. Reg. 69,903 (Nov. 18, 2005). Although Tribal members were able to harvest year-round in the past, they are now only able to fish a few weeks per year, and the Tribe's fisheries are restricted to certain species and for short periods of time (days or even hours) in certain areas. Such restrictions profoundly affect the Tribe's members' ability to exercise their treaty fishing rights. In order to limit such interference, the Tribe prioritizes work to maintain and recover salmon stocks in the region, including protecting the habitats that listed salmonid species depend on throughout their life cycles.

20.    The Tribe is involved in habitat protection and restoration in at least three major roles: funding and participating in scientific study and fisheries management; funding and carrying out habitat restoration efforts; and participating in processes resulting from implementation of Sections 7 and 10 of the ESA, 16 U.S.C. §§ 1536, 1539, which authorize incidental take that would otherwise be unlawful under Section 9 of the ESA, 16 U.S.C. § 1538.

21.    The Tribe submitted comments opposing the Services' proposed rescission of the harm definitions and requested government-to-government consultation on May 19, 2025. *See* Letter from Bill Sterud, Chairman, Puyallup Tribe of Indians, to Doug Burgum, Sec., U.S. Dep't of the Interior, and Howard Lutnick, Sec., U.S. Dep't of Commerce (Comment ID FWS-HQ-ES-2025-0034-213042) (May 19, 2025), https://www.regulations.gov/comment/FWS-HQ-ES-2025-0034-213042. The Tribe is concerned with the conservation of imperiled species, including those they reserved their right to harvest in perpetuity under the Treaty of Medicine Creek. Protecting fish habitat from destruction, modification, and degradation can arrest the decline and help increase the production of threatened and endangered fish, which can result in fewer restrictions on Tribal fisheries and greater harvest by Tribal fishers. For many listed species of importance to the Tribe, including Puget Sound Chinook salmon, Puget Sound steelhead, and bull trout, the listings have been necessitated due to habitat modification and degradation. *See infra* ¶¶ 25–27. Moreover, jeopardy determinations and the amount of incidental take that must be mitigated is largely based on the expected loss and modification of habitat. *E.g.*, ESA Section 7(a)(2) Biological Opinion for 2024-2025 Puget Sound Chinook Harvest Plan, https://repository.library.noaa.gov/view/noaa/61406/noaa_61406_DS1.pdf. The Services' Rescission will injure the Tribe by removing essential protections for listed fish

species upon which the Tribe relies and to which the Tribe reserved its fishing rights by treaty in 1854, among other injuries. The Tribe's Treaty, cultural, spiritual, educational, dietary, and commercial interests, among others, have been, are being, and, unless the requested relief is granted, will continue to be adversely and irreparably injured by the Rescission and by the Services' express adoption of Justice Scalia's dissenting interpretation. These are actual, concrete injuries, traceable to the Services' conduct, that would be redressed by the requested relief of reinstating the harm definitions. The Tribe has no adequate remedy at law.

## II. DEFENDANTS

22. Defendant National Marine Fisheries Service (NMFS), also known as NOAA Fisheries, is an office of the National Oceanic and Atmospheric Administration (NOAA) within the U.S. Department of Commerce charged with administering the ESA with regard to threatened and endangered marine species.

23. Defendant United States Fish and Wildlife Service (USFWS), an agency of the U.S. Department of the Interior, is charged with administering the ESA with regard to threatened and endangered terrestrial and freshwater species.

## BACKGROUND

## I. THE IMPORTANCE OF HABITAT TO LISTED SPECIES IN PUGET SOUND

24. The overwhelming consensus of the scientific community is that habitat degradation is the leading cause of species loss, and that species recovery is only possible through habitat protection and restoration. Habitat modification and degradation—including, among others, habitat loss, fragmentation, and isolation—impact threatened and endangered species in profound ways. Habitat loss can disrupt essential ecological functions such as breeding, feeding, and sheltering of threatened and endangered species. Members of species

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

10

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

experiencing habitat loss, fragmentation, and degradation may be disturbed in their day-to-day movements, such as nesting, foraging, and migrating. For many, adverse modification and degradation of habitat is the very reason for the species' listing as endangered or threatened under the ESA.

25.    When listing the Puget Sound Chinook salmon Evolutionary Significant Unit (ESU) as threatened, NMFS observed habitat degradation was a contributing cause of the species' decline:

> [A] substantial amount of habitat throughout the Puget Sound region has been degraded or blocked by dams and other barriers. In general, upper tributaries have been negatively affected by forest practices and lower tributaries and mainstem rivers have been impacted by agriculture and/or urbanization. Diking for flood control, draining and filling of freshwater and estuarine wetlands, and sedimentation due to forest practices and urban development are cited as problems throughout the ESU.

64 Fed. Reg. at 14,318 (citation omitted). The listing also included "Take Guidance," to provide public notice of potential actions that NMFS believed could potentially harm, injure, or kill the listed species. *Id.* The top listed causes of take were associated with habitat degradation:

> Activities that NMFS believes could potentially harm, injure or kill chinook salmon in the listed ESUs and result in a violation of section 9 of the ESA include, but are not limited to: (1) land-use activities that adversely affect chinook salmon habitat in this ESU (e.g., logging, grazing, farming, road construction in riparian areas, and areas susceptible to mass wasting and surface erosion); (2) destruction or alteration of chinook salmon habitat in the listed ESUs, such as removal of large woody debris and "sinker logs" or riparian shade canopy, dredging, discharge of fill material, draining, ditching, diverting, blocking, or altering stream channels or surface or ground water flow[.]

*Id.* at 14,326. In 2005, when NMFS reaffirmed the species' threatened status, it quoted USFWS' harm definition (50 C.F.R. § 17.3) in full and repeated the habitat degrading activities identified in the 1994 listing as the top likely causes of "take." Final Listing Determinations for

COMPLAINT FOR DECLARATORY AND    11    KANJI & KATZEN, P.L.L.C.
INJUNCTIVE RELIEF                               811 1st Ave., Suite 640
                                                Seattle, WA 98104

16 ESUs of West Coast Salmon, and Final 4(d) Protective Regulations for Threatened Salmonid ESUs, 70 Fed. Reg. 37,160, 37,196 (June 28, 2005).

26.     NMFS made similar observations regarding the effect of habitat destruction and modification when listing Puget Sound steelhead as threatened, stating:

> The principal factor for decline for Puget Sound steelhead is the present or threatened destruction, modification, or curtailment of its habitat or range. Barriers to fish passage and adverse effects on water quality and quantity resulting from dams, the loss of wetland and riparian habitats, and agricultural and urban development activities have contributed and continue to contribute to the loss and degradation of steelhead habitats in Puget Sound….We concluded that existing regulatory mechanisms inadequately protect steelhead habitats as evidenced by the historical and continued threat posed by the loss and degradation of nearshore, estuarine, and lowland habitats due to agricultural activities and urbanization.

72 Fed. Reg. at 26,732.

27.     USFWS likewise identified habitat alteration, including "land and water management activities that degrade bull trout habitat," as driving the need for listing all populations of bull trout within the coterminous United States as threatened in 1999. 64 Fed. Reg. at 58,921. For Puget Sound bull trout specifically, USFWS noted that "[a]quatic habitat in the Nisqually, Puyallup, and Green rivers has been variously degraded by logging, agriculture, road construction, and urban development." *Id*. at 58,914. In providing take guidance, the agency indicated many types of habitat alteration could constitute take:

> Destruction or alteration of riparian or lakeshore habitat and adjoining uplands of waters supporting bull trout by timber harvest, grazing, mining, hydropower development, road construction or other developmental activities that result in destruction or significant degradation of cover, channel stability, substrate composition, temperature, and migratory corridors used by the species for foraging, cover, migration, and spawning.

*Id.* at 58,929.

28.     Decades after these ESA listings, habitat destruction and alteration remain a major cause for concern with respect to the survival and recovery of listed species in Puget

Sound. For instance, estuarine and nearshore habitats are especially important for the listed juvenile salmon, providing rearing areas that support growth and improving marine survival. But over seventy percent of Puget Sound's historic tidal wetlands have been lost or degraded due to physical alterations, including shoreline armoring, diking, channelization, and tide gate infrastructure. These modifications reduce habitat quality and connectivity, thereby limiting juvenile salmon access to productive environments and reducing the number of adult salmon that return to spawning grounds. In addition, listed Southern Resident killer whales primarily rely on salmon, and in particular Chinook salmon, for their food supply. Thus, habitat degradation has direct and indirect effects—both short-term and cumulatively—on the Southern Resident killer whale prey supply and overall population viability. 70 Fed. Reg. at 69,910.

## II.   ENDANGERED SPECIES ACT

29.    In 1973, Congress enacted the Endangered Species Act in recognition of the fact that many of the nation's species had "been rendered extinct as a consequence of economic growth and development untampered by adequate concern and conservation" and other species had been "so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(1)–(2). The ultimate goal of the ESA is the recovery of endangered and threatened species to the point where they no longer need ESA protection. *Id.* §§ 1531(b), 1532(3). In both the statutory text and legislative history, Congress recognized the essential relationship between habitat and threatened and endangered species, stating the very purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id.* § 1531(b).

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

13

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

30.     A species comes under the protection of the ESA when the Secretary of the Interior or the Secretary of Commerce, acting through the Services, lists the species as either "endangered" or "threatened" under Section 4 of the statute. *See id.* § 1533. A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20); *see also id.* § 1533(c). One of the factors for listing is "the present or threatened destruction, modification, or curtailment of its habitat or range." *Id*. § 1533(a)(1)(A).

31.     Section 9 of the ESA makes it "unlawful for any person" to "take" any endangered fish or wildlife species within the United States, territorial seas, or high seas. *Id.* § 1538(a)(1). Pursuant to the Services' authority under Section 4(d) of the ESA, *id*. § 1533(d), the Services have promulgated regulations that apply the take prohibition to certain threatened fish species, including threatened species of West Coast salmon and steelhead. *E.g.*, 50 C.F.R. § 223.203. The ESA defines the term "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The take prohibition is to be interpreted broadly to include "every conceivable way in which a person can 'take' wildlife," including substantial impacts from habitat modification or degradation. *E.g.*, S. Rep. No. 93-307, at 7 (1973); *Sweet Home*, 515 U.S. at 696–708.

32.     Notwithstanding the Section 9 "take" prohibition, the Services can provide exemptions from liability for incidental take. For non-federal applicants, ESA Section 10 authorizes the issuance of permits "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Under the 1982 amendments to the ESA, "incidental take permits" (ITPs) may be issued once (1) an applicant

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

14

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

has submitted to the Services a "conservation plan" that describes, among other things, the impact of the anticipated taking, the planned steps to minimize and mitigate those impacts, the available funding to take those steps, and the alternatives to the taking that were considered by the applicant, *id.* § 1539(a)(2)(A); and (2) the Services conclude that the applicant will minimize and mitigate the impacts of the incidental take "to the maximum extent practicable," that there is adequate funding for the habitat conservation plan, and that the taking "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild," *id.* § 1539(a)(2)(B). The Services have issued hundreds of ITPs since Congress created the incidental take permit program in 1982, enabling non-federal actors to engage in activities that cause incidental take while balancing the survival needs of listed species.

33.    ESA Section 7(a)(2) governs federal agency actions, including those that may result in incidental take. That provision directs "[e]ach Federal agency" to consult with NMFS or USFWS (depending on which agency has jurisdiction over the species) to "insure that any action authorized, funded, or carried out" by the Services "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." *Id.* § 1536(a)(2).

34.    Agency "action" under Section 7 broadly includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas," specifically including "the promulgation of regulations," "the granting of licenses" and "permits," and "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

35.    "Jeopardize the continued existence of" is defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of

COMPLAINT FOR DECLARATORY AND          15          KANJI & KATZEN, P.L.L.C.
INJUNCTIVE RELIEF                                   811 1st Ave., Suite 640
                                                    Seattle, WA 98104

both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id.*

36. "Destruction or adverse modification" is defined as "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

37. Section 7(a)(2) requires each federal action agency to determine whether its actions "may affect" any endangered or threatened species or designated critical habitat. *Id.* § 402.14(a). If the action agency determines that its proposed action is "not likely to adversely affect" any listed species or critical habitat, the consulting agency (i.e., NMFS and/or USFWS) must concur in writing. *See id.* § 402.13(c). If the consulting agency does not concur—or if the action agency determines in the first instance that its proposed action is "likely to adversely affect" listed species or critical habitat—the action agency must formally consult with one or both of the consulting agencies to ensure it does not violate the Section 7(a)(2) prohibition on "jeopardy" and "destruction or adverse modification." *Id.* § 402.14(a), (b)(1).

38. Formal Section 7 consultation results in a "Biological Opinion" prepared by the consulting agency, which describes the proposed action's expected impact on listed species and critical habitat and the consulting agency's opinion on whether the action is "[l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1)(iii), (iv)(A). Each agency must "use the best scientific and commercial data available" in fulfilling the requirements of Section 7(a)(2). 16 U.S.C. § 1536(a)(2).

39. Similar to Section 10, Section 7 establishes a process for authorizing federal actions that will incidentally take—but not jeopardize the continued existence of—ESA-listed

species. For such actions, the consulting agency must provide the action agency with a statement that specifies the expected impact of such taking and prescribes reasonable and prudent measures to minimize such impact and terms and conditions to implement such measures. *Id.* § 1536(b)(4). Any incidental taking that complies with the terms and conditions of the incidental take statement (ITS) is not prohibited by the ESA. *Id.* § 1536(o)(2).

40.    The Services themselves are not exempt from the Section 7(a)(2) consultation requirement. When NMFS or USFWS is both the action agency and the consulting agency, as in this case, they must engage in intra-Service (internal) consultation. *See* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* 1-5 to 1-6, App'x E (1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

## III.    NATIONAL ENVIRONMENTAL POLICY ACT

41.    Congress enacted the National Environmental Policy Act for these purposes: "To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation[.]" 42 U.S.C. § 4321. To carry out the national environmental policy, Congress declared that "it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may…fulfill the responsibilities of each generation as trustee of the environment for succeeding generations; …attain the widest range of beneficial uses of the environment without degradation, risk to

COMPLAINT FOR DECLARATORY AND       17       KANJI & KATZEN, P.L.L.C.
INJUNCTIVE RELIEF                                       811 1st Ave., Suite 640
                                                                Seattle, WA 98104

health or safety, or other undesirable and unintended consequences; … [and] preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice." *Id*. § 4331(b).

42.      To ensure that the environmental consequences of federal actions are known *before* they are approved, NEPA requires that "all agencies of the Federal Government," including the Services, prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment" that fully evaluates, among other things, the environmental impacts of the proposed action and a reasonable range of alternatives to the proposed action, including alternatives that would have lesser adverse environmental consequences. *See id.* § 4332(2)(C). An agency must "make use of reliable data and resources," *id.* § 4332(2)(E), and "ensure the professional integrity, including scientific integrity, of the discussion and analysis in [its] environmental document," *id.* § 4332(2)(D).

43.      NEPA establishes procedures to determine the level of environmental review required. Environmental impact statements (EISs) must be prepared for proposed agency actions that have "a reasonably foreseeable significant effect on the quality of the human environment." *Id.* § 4336(b)(1). A more streamlined environmental assessment (EA) may be completed to determine whether a proposed agency action will have significant effects (in which case an EIS must be completed), and if the agency finds it will not have significant effects, to set forth the basis for that finding. *Id.* § 4336(b)(2).

## IV.    HISTORY OF THE "HARM" DEFINITION

44.      The regulation of "take" is a fundamental element of the programs established under Sections 7, 9, and 10 of the ESA. As indicated above, in the ESA, Congress defined

COMPLAINT FOR DECLARATORY AND        18        KANJI & KATZEN, P.L.L.C.
INJUNCTIVE RELIEF                                 811 1st Ave., Suite 640
                                                 Seattle, WA 98104

"take" to include the word "harm." 16 U.S.C. § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."). For half a century, the Services unwaveringly regulated significant habitat modification or degradation that poses significant adverse consequences for listed fish and wildlife as a form of "harm" constituting "take" under these programs. Until now, no administration had ever questioned this fundamental precept of biology.

45.     Two years after the ESA's enactment, in 1975, USFWS first promulgated a definition for the word "harm":

> "Harm" in the definition of "take" in the Act means an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; significant environmental modification or degradation which has such effects is included within the meaning of "harm[.]"

40 Fed. Reg. at 44,416.

46.     In 1981, USFWS clarified the "harm" definition "on the grounds that the existing language could be construed as prohibiting the modification of habitat even where there was no injury to the listed endangered or threatened wildlife." 46 Fed. Reg. at 54,748. To "obviate any such erroneous application," *id.*, USFWS slightly modified the "harm" definition to make clear that to constitute "harm," and therefore "take," the habitat destruction must "actually kill[] or injure[] wildlife":

> "Harm" in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

*Id.* at 54,750. For 45 years, until the Services' July 14, 2026, Rescission, this definition remained in the Code of Federal Regulations (50 C.F.R. § 17.3).

47.    Congress amended the ESA a year later to add the Section 10 incidental take program. The amendment expressly established Congress's intent for "take" to encompass more than just deliberate and intentional impacts. Indeed, the very purpose of the provision is to allow the Services to issue permits for takings that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Section 10 only exists because the ESA's take prohibition extends to those takings that are not deliberate or intentional, and the legislative history from 1982 explicitly states that "harm," as used in the "take" definition, "may occur as a result of habitat modification." S. Rep. No. 97-418, at 26 (1982).

48.    In 1995, the Supreme Court upheld USFWS' definition of "harm" in *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 US 687 (1995). The Court held that the "text and structure of the Act, its legislative history, and the significance of the [post-enactment] 1982 amendment" all supported the definition. *Sweet Home*, 515 U.S. at 695. The Court concluded that the "ordinary understanding of the word 'harm'" (i.e., "to cause hurt or damage to: injure") did not "suggest in any way that only direct or willful action that leads to injury constitutes 'harm,'" *id*. at 697, and that "harm" must have independent meaning from the other words contained in the "take" definition, or else it would be surplusage, *id*. at 698. Congress's broad intent to provide comprehensive protection for listed species and its 1982 amendment establishing the incidental take permit program—suggesting that "Congress understood [Section 9] to prohibit indirect as well as deliberate takings"—further supported the definition. *Id*. at 698–701. Moreover, the legislative history made clear that "Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions" and that "Congress had habitat modification directly in mind" when it added Section 10, further confirming the

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

20

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

soundness of the definition. *Id*. at 704–708. The *Sweet Home* Court explicitly rejected the interpretation—proffered by the dissent and the D.C. Court of Appeals in the opinion below (which the Services have now adopted) —that "harm" was limited to activities associated with hunting and deliberate killing as inconsistent with the ESA, concluding the interpretation was based on a flawed premise, disregarded contradictory statutory text, and misapplied the *noscitur a sociis* interpretive canon. *Id.* at 701–02.

49.    NMFS formally promulgated its definition of "harm" in 1999 following the listings of Pacific salmon and steelhead to dispel any doubt that "NMFS also interprets harm to include habitat destruction." 64 Fed. Reg. at 60,727. NMFS clarified its harm definition was consistent with that of USFWS, emphasizing that its regulation was "not a change in existing law" and only serves to "provide[] clear notification to the public that habitat modification or degradation may harm listed species and, therefore, constitutes a take under the ESA as well as ensuring consistency between NMFS and [USFWS]." *Id.*

50.    NMFS' definition is nearly identical to USFWS' definition:

> *Harm* in the definition of "take" in the Act means an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering.

50 C.F.R. § 222.102.

51.    As NMFS noted nearly thirty years ago, the "harm" definition "is supported by the broad purpose of the ESA to conserve endangered and threatened species." 64 Fed. Reg. at 60,727.

52.    Understanding habitat degradation that actually injures or kills listed species constitutes unlawful "take," the Services have relied on the "harm" definitions when listing

species as threatened and endangered, negotiating long-term mitigation plans, and issuing incidental take authorizations pursuant to ESA Section 7, 16 U.S.C. § 1536 (federal agency actions) and ESA Section 10, *id.* § 1359 (private actions). Indeed, it is their policy "to identify, to the extent known at the time a species is listed, specific activities that will not be considered likely to result in violation of section 9" and "activities that will be considered likely to result in violation also will be identified in as specific a manner as possible." Notice of Interagency Cooperative Policy for Endangered Species Act Section 9 Prohibitions, 59 Fed. Reg. 34,272, 34,272 (July 1, 1994). As detailed above, *supra* ¶¶ 25, 27, forms of habitat modification are frequently listed as activities considered likely to result in a take violation.

**IV.    THE SERVICES' RESCISSION OF THE "HARM" DEFINITION**

53.    In the spring of 2025, after 50 years of consistently defining "harm" to include significant habitat modification or degradation that actually kills or injures listed fish and wildlife, the Services did an about-face and jointly proposed to fully rescind the definitions of "harm" from 50 C.F.R. § 17.3 (USFWS regulation) and 50 C.F.R. § 222.102 (NMFS regulation). Rescinding the Definition of "Harm" Under the Endangered Species Act, 90 Fed. Reg. 16,102 (Apr. 17, 2025) ("Proposed Rule"). The Services received more than 357,000 comments on the Proposed Rule. These comments, representing Tribal, state, regulatory, and environmental interests, overwhelmingly opposed the Proposed Rule. In addition to expressing concerns that the Services ignored their statutory responsibilities under the ESA and NEPA, many presented scientific, legal, and cultural arguments against the rescission, including extensive scientific evidence that the rescission would have negative consequences for listed species. Many of the comments, such as those from Tribes, States, and those involved in the habitat restoration field, described important reliance interests and treaty rights that would be

disturbed by rescission of the "harm" definitions. Many federally recognized tribes requested government-to-government consultation with the Services regarding their concerns about the Proposed Rule and all were denied.

54. The Services finalized the Rescission on July 14, 2026. Rescinding the Definition of "Harm" Under the Endangered Species Act, 91 Fed. Reg. 43,330 (July 14, 2026). Much as they had in the Proposed Rule, 90 Fed. Reg. at 16,104, in order to justify the sudden retreat from their half century-old harm definition, the Services erroneously claimed they were "compelled" to rescind the harm definitions under the Supreme Court's holding in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), and their constitutional obligation to "take Care that the Laws be faithfully executed," U.S. Const., art. II, section 3. 91 Fed. Reg. at 43,301, 43,307. Because the *Sweet Home* Court evaluated the harm definition under the then-controlling *Chevron* doctrine, which required judicial deference to reasonable agency interpretations of ambiguous statutory terms, the Services proclaimed that *Loper Bright* forced them to rescind the regulatory definitions of "harm" and effectuate what they consider to be "the single, best meaning of the statute"—Justice Scalia's dissent in *Sweet Home*. *Id.* at 43,301.

55. In *Loper Bright*, the Supreme Court overruled the *Chevron* doctrine. The Court concluded that the APA "codifies for agency cases…that courts decide legal questions by applying their own judgment" and "command[s]…that 'the reviewing court'—not the agency whose actions it reviews—is to 'decide *all* relevant questions of law' and 'interpret…statutory provisions.'" *Loper Bright*, 603 U.S. at 391–92, 398 (quoting 5 U.S.C. § 760). The Court held that even ambiguous statutes "must…have a single, best meaning," after applying all relevant interpretive tools, such that deference to agencies has no place in statutory interpretation. *Id*. at 400. In doing so, the Court verified that statutory interpretation, including resolution of

statutory ambiguities in APA cases, was the province of judges armed with "the traditional tools of statutory construction," not "political actors" armed with "individual policy preferences." *Id.* at 399–400, 403–04.

56.     Confusing their own role with the role of the judiciary under *Loper Bright*, the Services concluded that the longstanding definition of "harm," though upheld by the Supreme Court in *Sweet Home*, does "not match the single, best meaning of the statute." 91 Fed. Reg. at 43,301. Instead, the Services concluded that "single, best meaning" could be found in Justice Scalia's dissenting opinion, *id.*, which relied on a historical understanding that the word "'take,' when applied to wild animals, means to reduce those animals, by killing or capturing, to human control,'" such that all the verbs within Congress's statutory definition of "take," including "harm," "should be construed to require an 'affirmative act[]…directed immediately and intentionally against a particular animal,'" *id.* (alteration in original) (quoting *Sweet Home*, 515 U.S. at 717, 719–20 (Scalia, J., dissenting)). The Services did not explain why the dissent's construction of a different term entirely represented the "single, best meaning" of "harm" as opposed to the majority opinion's interpretation, nor why it should control even though the *Sweet Home* Court explicitly rejected it, nor why it should supplant Congress's own definition of the term.

57.     The Services also disregarded the *Loper Bright* Court's caution that the Court did "not call into question prior cases that relied on the *Chevron* framework" and that "[t]he holdings of those cases that specific agency actions are lawful…are still subject to statutory *stare decisis* despite our change in interpretive methodology," *Loper Bright*, 603 U.S. at 412, as well as the Court's reminder that the federal courts have always indicated that "very great respect" is "warranted when an Executive Branch interpretation was issued roughly

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

24

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

contemporaneously with enactment of the statute and remained consistent over time," as is the case here, *id*. at 385–86 (citing *Edwards' Lessee v. Darby*, 25 U.S. 206 (1827); *United States v. Dickson*, 40 U.S 141 (1941)). Instead, while acknowledging the existence of *Loper Bright*'s holding regarding *stare decisis*, they ultimately rendered it meaningless claiming that because the *Sweet Home* Court did not say the Services' longstanding "harm" definition was the "only possible such reading"—which would be strange indeed in a case employing an interpretive methodology specifically designed to address ambiguity—*the Services* could determine its "illegality," 91 Fed. Reg. at 43,302, precisely what political actors are not equipped to do under *Loper Bright*.

58.     The Services concluded that codification of a new "freestanding" definition to replace the longstanding "harm" definition in the final Rescission was "unnecessary," asserting that the ESA supplies all the definition that is needed both because "take" is defined in the statute and because "the role and meaning of the term 'harm' within the larger definition of 'take' was expertly explicated by Justice Scalia in his *Sweet Home* dissent—an interpretation which we have herein adopted[.]" *Id.* Thus, while the Services did not promulgate a new rule defining "harm," they explicitly adopted the interpretation of "harm" that they intend to control going forward—a "novel" dissenting construction that the *Sweet Home* Court explicitly rejected. *Id.*; *Sweet Home*, 515 U.S. at 701–702 & n.15. The Services are clear that their "best interpretation of the ESA…does not permit agencies to factor in habitat modification or degradation in the context of section 9 prohibited take." 91 Fed. Reg. at 43,310.

59.     The Services included no scientific rationale for the Rescission, nor did they cite any scientific research to support it, nor did they show that it would be beneficial or even neutral with respect to preventing extinction or promoting recovery. The Services did not

engage at all with the extensive scientific record showing that the Rescission would have negative consequences for listed species, recognizing only that the Rescission would reduce habitat protection measures but with no analysis of the effect of that reduction on listed species like Puget Sound Chinook salmon, Puget Sound steelhead, and bull trout. *Id.* at 43,304–05. The Services gave only cursory attention to the significant reliance interests set forth in public comments, asserting that any reliance interests were "outweighed by the constitutional interest" and dismissing sovereign reliance interests in the "harm" definition's role in larger conservation frameworks as "policy disagreements." *Id.* at 43,308–09. The Services concluded that the Rescission had "no tribal implications," but neither analyzed the effects of the Rescission on tribes' ability to exercise their treaty-protected fishing rights nor granted multiple federally recognized tribes' requests for government-to-government consultation for them to explain the tribal implications. *See id.* at 43,312, 43,315–16.

60.     With respect to NEPA compliance, the Services wrongly asserted that the Rescission is a "nondiscretionary action" and thus exempted themselves from NEPA review under 42 U.S.C. § 4336(a)(4), which waives environmental review requirements for non-discretionary actions over which an agency "does not have authority to take environmental factors into consideration in determining whether to take the proposed action." *Id.*; *see also* 91 Fed. Reg. at 43,316. Alternatively, the Services asserted, again wrongly, that the Rescission qualified for the USFWS' categorical exclusion (which NMFS adopted) for "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case" (43 C.F.R. § 46.210(i)) because the Rescission will have "no

COMPLAINT FOR DECLARATORY AND          26          KANJI & KATZEN, P.L.L.C.
INJUNCTIVE RELIEF                                                811 1st Ave., Suite 640
                                                                      Seattle, WA 98104

significant individual or cumulative effect on the quality of the human environment." *Id*. at 53,316. Nowhere do the Services describe or evaluate the environmental impacts of the Rescission, nor do they provide any meaningful description of the basis for their determination that "the extraordinary circumstances listed in 43 CFR 46.215 do not apply to the direct effects of the proposed action." *Id*.

61. With respect to ESA Section 7 compliance, the Services assert that the Rescission does not require them to consult, arguing that "the plain language, structure, and purposes of the ESA…[do] not place a consultation obligation on the Services' administration of the [ESA]." *Id*. Thus, the Services engaged in no Section 7(a)(2) consultation.

62. Imminent illegal habitat destruction will result from the Rescission. The Rescission and the Services' newly adopted interpretation, which "does not permit agencies to factor in habitat modification or degradation in the context of section 9 prohibited take," *id*. at 43,310, will have immediate effect on pending Section 7 consultation decisions for federal projects and ITP applications for non-federal projects where take has been anticipated from habitat degradation and destruction, as well as on the Services' perceived monitoring and enforcement obligations for existing ITPs and ITSs. The Services will no longer prescribe reasonable and prudent measures or alternatives to minimize the impact of habitat-related takings or the terms and conditions necessary to implement such measures. *See* 16 U.S.C. § 1536(b)(4)(C)(ii), (iv). And the Services have even explicitly stated that if a "permittee is mitigating only for habitat impacts that were considered prohibited as take when their permit was issued, the permittee may choose to return their permit in order to not have to continue expending resources to mitigate." 91 Fed. Reg. at 43,305.

63.     The Rescission will also cause regulatory confusion by signaling that—for the first time in the Services' over fifty-year administration of the ESA—the Services will no longer require ITPs for any modification or degradation of listed species' habitat, or otherwise treat modification or destruction of habitat as "take" under the ESA. Entities that heretofore would have been required to obtain ITPs for proposed actions that threatened habitat modification and destruction that actually kills or injures listed fish and wildlife will no longer, according to the Services, need to comply with the regulatory process to avoid and reduce the resulting impacts on listed species, including by preparing conservation plans that minimize and mitigate the impacts of the incidental take "to the maximum extent practicable." 16 U.S.C. § 1539(a)(2)(B). The same is true for ITSs. Moreover, notwithstanding the Services' suggestion that ITPs and ITSs finalized before the effective date of the Rescission "will not be required to be reevaluated under this final rule," 91 Fed. Reg. at 43,302, the continuing legal validity of existing ITPs and Section 7 consultations will be in question, and permitees may well decide they no longer need to abide by the terms and conditions of their existing ITPs and ITSs regarding conservation measures.

## FIRST CLAIM FOR RELIEF

**Violation of the Endangered Species Act and Administrative Procedure Act: Arbitrary and Capricious, Contrary to Law, and Failure of Rational Decisionmaking**

64.     The Tribe re-alleges and incorporates by reference each allegation set forth in this Complaint.

65.     The ESA prohibits "take," including "harm" that involves actual killing or injury of imperiled species resulting from habitat modification or degradation. 16 U.S.C. §§ 1532(19), 1539(a)(1)(B).

66. Under the APA, a "reviewing court shall…hold unlawful and set aside" federal agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2).

67. When promulgating a rule, the Services must articulate a satisfactory explanation for their action, including a rational connection between the facts found and the choice made. A regulation is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

68. An agency changing course must show "that the new policy is permissible under the statute [and] that there are good reasons for it." *Fed. Commc'ns Comm'n v. Fox Television Stations*, 556 U.S. 502, 515 (2009). "An agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm*, 463 U.S. at 42.

69. The Services failed to articulate a satisfactory explanation or rational justification for the Rescission. The Services rescinded a 50-year definition of "harm," which had been upheld by the Supreme Court in *Sweet Home* as reasonable and consistent with the ESA. In its place, the Services adopted a statutory construction proffered by the dissenting opinion in *Sweet Home*, which the majority explicitly rejected as inconsistent with the statutory text, structure, and legislative history. The Services had no rational justification for their

decision to adopt the sole statutory construction of "harm" that the Supreme Court had already explicitly rejected.

70. Further, the Services subverted the holdings of *Loper Bright*. Rather than respect the Supreme Court's holding that only the judiciary—and not political actors that may be motivated by political policy preferences—is equipped to determine the meaning of ambiguous statutory terms, the Services took it upon themselves to conclude that the definition of "harm" was "illegal" despite the fact that it had been upheld by the Supreme Court, was promulgated contemporaneously with the statute, and had been consistent for half a century. Moreover, the Services employed a previously unheard-of—and nonsensical—test for a prior court decision employing the *Chevron* interpretive methodology to be entitled to *stare decisis*: not only would a court need to have found an agency interpretation of an ambiguous statutory term "reasonable" under the *Chevron* doctrine, but it would *also* have needed to determine that the interpretation was "the only possible…reading" of the ambiguous statutory term. *See* 91 Fed. Reg. at 43,301.

71. The Services' Rescission of the harm definitions is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the ESA and the APA. 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF – NEPA VIOLATION

**Violation of the National Environmental Policy Act and Administrative Procedure Act: Failure to Prepare an Environmental Impact Statement/Environmental Analysis and Invalid Use of Categorical Exclusion**

72. The Tribe re-alleges and incorporates by reference each allegation set forth in this Complaint.

73.     NEPA requires an agency undertaking a "major Federal action[] significantly affecting the quality of the human environment" to prepare a "detailed statement" on the environmental impacts of its action and reasonable alternatives. 42 U.S.C. §§ 4332(2)(C), 4336(b)(1). Even where an agency's undertaking "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," the agency must evaluate the impact of its action in an environmental assessment. *Id.* § 4336(b)(2).

74.     The Rescission abandoned a Supreme Court-approved, statutorily-based, and longstanding definition of the term "harm," which protected listed fish and wildlife from habitat destruction that actually killed or injured listed species for the first time in the history of the Endangered Species Act. The Services instead chose to interpret the term "harm" in a way that "does not permit agencies to factor in habitat modification or degradation in the context of section 9 prohibited take." 91 Fed. Reg. at 43,310. The Services' action "has a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). Nevertheless, the Services failed to evaluate the Rescission in an environmental impact statement or even an environmental assessment.

75.     The Services erroneously asserted that the Rescission is "a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration" and therefore exempt from NEPA. *Id.* § 4336(a)(4). The Rescission is discretionary, and the Services' contention that the ESA compels the Rescission is unfounded. Even if, for the sake of argument, the Services had properly interpreted the ESA, they failed to evaluate alternatives to the Rescission as required by NEPA, including abiding by statutory *stare decisis* principles as discussed in *Loper Bright*.

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

31

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104

76. The Services also erroneously asserted, in the alternative, that the Rescission qualifies for a categorical exclusion from NEPA analysis reserved for "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i); NOAA NEPA Guidance at App'x E, E-14. However, the Rescission will have concrete impacts on listed species and is not of a merely "administrative, financial, legal, technical, or procedural nature." 43 C.F.R. § 46.210(i). The effects of the Rescission are not too broad, speculative, or conjectural to analyze, and the effects will not be subject to the NEPA process later. The referenced categorical exclusion is inapplicable.

77. No categorical exclusion is available to the Services because the Rescission presents extraordinary circumstances. The Department of the Interior (in which USFWS resides) has determined that extraordinary circumstances exist for actions that "[h]ave significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species." 43 C.F.R. § 46.215(g). NMFS has described extraordinary circumstances as including "considerable adverse effects on species or habitats protected by the Endangered Species Act." NOAA Policy and Procedures for Compliance with NEPA at 9 (2025), https://www.noaa.gov/sites/default/files/2025-06/2025NOAANEPAProcedures.pdf. The effects of the Rescission on species currently—and proposed to be—listed and protected under the ESA are significant and adverse. Other extraordinary circumstances that apply to the Rescission are highly uncertain and potentially significant environmental effects, precedential

effect for future actions, and a potential violation of Federal law or requirements imposed for protection of the environment. *See* 43 C.F.R. § 46.215; NOAA NEPA Guidance at 9. Each of those extraordinary circumstances would be independently sufficient to prohibit the Services' reliance on a categorical exclusion.

78.     The Services' failure to analyze the environmental effects of the Rescission or examine a reasonable range of alternatives in an EIS, or even an EA, when promulgating the Rescission under a false claim of nondiscretionary action and improper use of a categorical exclusion violated NEPA and the APA. 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

WHEREFORE, the Tribe respectfully requests that this Court:

A.     Declare that the Services violated the APA, NEPA, and the ESA when they issued the Rescission;

B.     Vacate the Rescission;

C.     Reinstate the harm definitions previously set forth at 50 C.F.R. §§ 17.3 and 222.102;

D.     Enjoin the Services from applying the Rescission and require them to apply, utilize, and follow the harm definitions previously in force

E.     Grant such orders and/or injunctive relief as the Tribe may request to ensure that threatened and endangered species and their habitat do not suffer irreparable harm pending resolution of the merits of this case;

F.     Award the Tribe its reasonable fees, expenses, costs, and disbursements, including attorneys' fees associated with this litigation under the citizen suit provision of the

ESA, 16 U.S.C. § 1540(g)(4), Equal Access to Justice Act, 28 U.S.C. § 2412, or any other applicable law;

G.      Grant the Tribe such additional relief as the Court determines is just and proper.


Respectfully submitted this 14th day of July, 2026.


*s/Jane Steadman*
Jane Steadman, WSB #44395

*s/ Laura Boyer*
Laura Boyer, OSB #261755*

Kanji & Katzen, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104
(206) 344-8100
jsteadman@kanjikatzen.com
lboyer@kanjikatzen.com

*\* Pro hac vice application pending*

*s/Lisa A. Anderson*
Lisa A. Anderson, WSB #27877
Puyallup Tribe of Indians
3002 Duct Cho Street
Tacoma, WA 98404
(253) 573-7852
Lisa.Anderson@PuyallupTribe-nsn.gov


*Attorneys for Puyallup Tribe of Indians*

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

34

KANJI & KATZEN, P.L.L.C.
811 1st Ave., Suite 640
Seattle, WA 98104